**Ilya WOLSTON, Plaintiff,**

v.

**READER'S DIGEST ASSOCIATION, INC., doing business as Reader's Digest Press, et al., Defendants.**

Civ. A. No. 75–459.

United States District Court, District of Columbia.

Jan. 31, 1977.

Sidney Dickstein, Dickstein, Shapiro & Morin, Washington, D.C., for plaintiff.

Peter B. Hamilton, Williams, Connolly & Califano, Washington, D.C., for defendants.

## OPINION AND ORDER

BRYANT, District Judge.

In this diversity action the plaintiff, Ilya Wolston, seeks to recover compensatory and punitive damages for allegedly libelous statements about him that appear in the book *KGB, The Secret Work of Soviet Agents* (*"KGB"*), authored by defendant John Barron, published by defendant Reader's Digest, offered as a selection by defendants Book-of-the-Month Club and Macmillan Book Clubs, and reprinted in paperback by defendant Bantam Books. The defendants claim that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law, and have moved for summary judgment. Rule 56, Fed.R.Civ.P.; Local Rule 1–9(h). Wolston, Barron, and representatives of each of the other parties have submitted affidavits, plaintiff and defendant Barron have been deposed, and the court has heard oral argument by counsel for both sides.

The first question the court must consider is what degree of fault would plaintiff be required to demonstrate if this matter were to go to trial. Defendants claim a constitutional privilege with respect to statements they published concerning Wolston. They contend that he qualifies as a "public figure" for purposes of libel law, and they urge the court to adopt the "actual-malice" standard. *See, e.g., Curtis Publishing Co. v. Butts,* 388 U.S. 130 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Alternatively, defendants contend that Wolston became involved in a matter of "public concern" and that, in such a case, the law in the District of Columbia requires application of the actual-malice standard even if the plaintiff does not qualify as a public figure. *Hatter v. Evening*

*Star Newspaper Co.*, Civil No. 8298–75 (Sup.Ct.D.C. March 15, 1976). Wolston sees matters differently. He contends that he is a "private-individual" plaintiff for purposes of a libel suit and observes that, if that is so, the court can impose liability on defendants under any standard short of liability without fault. *See generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Time Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). He suggests that the court adopt either a negligence or gross negligence standard for libel concerning private individuals. He argues that the court is not bound by the decision of the Superior Court of the District of Columbia in *Hatter v. Evening Star, supra*, and that, in any event, the court should distinguish that decision.

The second question the court must consider is whether, under the appropriate standard, the pleadings, affidavits, and depositions demonstrate the existence of issues that are inappropriate for summary resolution. In this connection plaintiff disputes defendants' contention that no genuine issues of fact exist. He argues that defendants have failed to establish as a matter of law the nonexistence of fault on each of their parts and that this is so regardless of which standard of fault applies. Therefore, he claims, the court should deny defendants' motion and permit plaintiff to proceed to trial.

## I. FACTUAL BACKGROUND

In January 1957 Ilya Wolston, a naturalized American citizen residing in the District of Columbia,[1] received a subpoena directing him to appear before a special federal grand jury in New York City. The grand jury had been investigating the activities of Soviet intelligence agents in the United States; it summoned Wolston shortly after the Federal Bureau of Investigation arrested his aunt and uncle, Myra and Jack Soble, for espionage.[2]

Wolston traveled to New York on several occasions, but failed to respond to a subpoena requiring him to appear on July 1, 1958. He was charged with criminal contempt, he pleaded guilty, and he was sentenced to one year in prison. The sentence was suspended and Wolston was placed on probation for three years. His failure to appear before the grand jury and his subsequent plea of guilty were mentioned or discussed at the time in some fifteen newspaper stories in New York and Washington, D.C. Deposition of Ilya Wolston at 62–72.

In 1959 Viking Press, Inc. published the book *My Ten Years As A Counterspy*, by Boris Morros. A one-time confederate of Jack Soble who later served as an intelligence agent for the F.B.I., Morros in this book identified plaintiff as a Soviet agent in the United States. According to Morros, Soble claimed that an individual who had operated in Germany under the code name "Slava" had supplied him with information valuable to the Soviets.[3] Subsequently, Morros says in his book, Soble identified Ilya Wolston as "Slava."[4] Morros also states, however, that he knew Soble to be a "confirmed liar" and acknowledges that So-

1. Wolston was born in Russia in 1918. He subsequently lived in Lithuania, Germany, France, and England before coming to the United States in 1939. The army drafted him in 1942, and during his tour of duty he became a naturalized citizen; he was trained as an interpreter and served primarily in Alaska. After receiving an honorable discharge in 1946 he worked as an interpreter for the United States Military Government and the State Department in Allied-occupied Berlin. He returned to the United States in 1951 and worked as a clerk until 1953, when he enrolled in an undergraduate program at New York University. In 1955 he and his wife moved to Washington, D.C.,

where he worked several months for the Army Map Service and then as a free-lance translator until January 1957. Deposition of Ilya Wolston at 5–42.

2. The Sobles pleaded guilty in April 1957 to one count of an indictment charging them with violation of 18 U.S.C. § 793, the so-called "peacetime espionage statute."

3. Morros, *My Ten Years As A Counterspy*, 176, 183, 187–91, 193, 195–96, 204, 210, 222, 225, 229, 238, 247 (1959).

4. *Id.* at 247.

ble was his only source of information concerning Wolston.[5]

In a report entitled "Expose [sic] of Soviet Espionage May 1960" the F.B.I.[6] reiterated the information that Soble had furnished to Morros and noted that Soble had also described Wolston's intelligence activities to the government. *Id.* at 26. The report states:

"On several occasions beginning May 7, 1950, Jack Soble furnished Boris Morros with information concerning an individual he described as a U.S. Army Colonel in Germany who furnished him information under the code name 'Slava,' which was very valuable to the Soviets. It is noted that from October, 1949, until July, 1951, Wolston was employed by the U.S. High Commissioner of Germany in Berlin.[7] In January, 1955, Soble identified his nephew, Ilya Wolston, as 'Slava.' In addition, Jack Soble, pleading guilty in April, 1957, furnished information identifying Wolston as a Soviet agent who provided him information for the Soviets on several occasions beginning when Wolston was in a military camp, about 1943. Soble said Wolston gave him information concerning his assignments and names of four persons at the camp whom he believed could be approached by the Soviets.

"Information concerning the probable identification of Wolston as a Soviet agent was furnished to the Department of State in 1951, together with data developed concerning his black market activities in Germany. The Department of State, on the basis of these data, dismissed Wolston from his employment in Berlin."[8]

*Id.* at 25–27. The report does not indicate that its authors relied exclusively on Soble in identifying Wolston as an agent. On another page it simply lists Wolston's name among people "the F.B.I. investigation resulted in identifying as Soviet intelligence agents." *Id.* at 24.

The present action arises from the publication in 1974 of *KGB*, which summarizes Soviet espionage efforts since World War II. Wolston objects to the following sentence and footnote, which appear on page 188 of the Reader's Digest Press edition:

"Among Soviet agents identified in the United States were Elizabeth T. Bentley, Edward Joseph Fitzgerald, William Ludwig Ullman, William Walter Remington, Franklin Victor Reno, Judith Coplan, Harry Gold, David Greenglass, Julius and Ethel Rosenberg, Morton Sobell, William Perl, Alfred Dean Slack, Jack Soble, Ilya Wolston, Alfred and Martha Stern*

* No claim is made that this list is complete. It consists of Soviet agents who were convicted of espionage or falsifying information or perjury and/or contempt charges following espionage indictments, or who fled to the Soviet bloc to avoid prosecution . . . ."[9]

Plaintiff states that he did not serve as a Soviet agent and that he was never indicted for espionage;[10] he complains that assertions in *KGB* to the contrary have damaged

---

5. *Id.*

6. The F.B.I. prepared the report; it was published by the Senate Subcommittee to Investigate the Administration of the Internal Security Act, Committee on the Judiciary, 86th Cong., 2nd Sess. (1960).

7. *See* Note 1, *supra.*

8. In his deposition Wolston claims that a reduction in force accounted for the loss of his State Department job and that the reference to "black market activities" is false. Deposition of Ilya Wolston at 27–28, 89–90.

9. Plaintiff reads this footnote as falsely stating that he was indicted for espionage. Defendant Barron in his deposition claims that he meant to say no such thing. Rather, he states, "I believe and know that he [Wolston] fell in the category of someone who was convicted of contempt of court following espionage indictments, which raised matters about which he refused to testify." Deposition of John Barron at 57. Thus, according to Barron, the phrase "following espionage indictments" merely provides the context in which plaintiff's contempt conviction occurred.

10. *See* Note 9 *supra.* For purposes of this motion the court assumes plaintiff's contentions in this regard are true. At a trial on the merits, however, proof that the assertions in *KGB* are true would constitute a defense and bar plaintiff from recovering damages for libel.

his reputation, embarrassed, and humiliated him.[11] He contends that Barron knew that Soble was, as Morros put it, a "confirmed liar;" that Barron therefore had reason to doubt the F.B.I.'s report; that Barron failed adequately to investigate the charges he levelled against plaintiff and instead, together with the co-defendants, published *KGB* in reckless disregard of the truth of those charges.

Defendants contend that Wolston has brought this lawsuit 15 years too late, that is, that any damage he suffered as a result of identification of him as a Soviet agent is attributable to Morros's book and the F.B.I.'s report. In his affidavit defendant Barron states that for purposes of documenting information about Wolston he relied on the F.B.I.'s report,[12] that he had reason to believe the report was accurate,[13] and that he was "[a]t no time . . . aware of any fact that would give . . . [him] rea-

son to doubt the truth of . . . [that report] or of any other statement in it." [14] Thus, although he admits he was aware of Morros's views regarding Soble's credibility,[15] Barron claims that Soble's reputation for truthfulness caused him no concern because Soble had earned it while acting as a spy; [16] by contrast, according to Barron, Soble provided information to the Government after his arrest that proved "extremely useful and . . . quite reliable in many cases." [17] And in any event, according to Barron, the F.B.I. report clearly relied on sources other than Jack Soble in identifying Wolston as an agent.[18] Defendants Book-of-the-Month Club, Macmillan, and Bantam state that they relied on the reputation of Reader's Digest Press in concluding that *KGB* is accurate in every respect.[19] Defendant Reader's Digest admits that its liability in this suit in coextensive with that of John Barron, its employee.[20]

11. Although his complaint makes no mention of lost income, in Wolston's deposition he attributed loss of "potential income" to *KGB* on the ground that, "If I were not called a Soviet agent, I would most likely be well employed." Wolston Dep. at 105. Wolston acknowledges, however, that he was unemployed for the six years preceding publication of *KGB* with the exception of occasional services for which he received "very negligible" compensation. *Id.* at 53–54.

12. Affidavit of John Barron at 2. The report is cited in *KGB* as a source for chapter nine of the book, the chapter that contains references to the plaintiff. *KGB, The Secret Work of Soviet Agents* 430 (Reader's Digest Ed.) (1974).

13. In his deposition Barron indicates that he worked as a newspaper reporter for a number of years and that in that connection the F.B.I. provided him with consistently reliable information; that the F.B.I.'s report is consistent with other sources, i.e. Boris Morros's book; and that "this was a considered formal statement by the F.B.I. bearing the imprimatur and passive endorsement of a constituted committee of the Senate, responsible for internal security matters; and our experience has been that statements of the F.B.I. issued under such circumstances are reliable and legally defensible." Deposition of John Barron at 66–67.

14. Affidavit of John Barron at 3.

15. Deposition of John Barron at 73.

16. Barron says in his deposition: "I think we are speaking about, in a sense, two different people here—the Jack Soble as a Soviet agent and still under Soviet discipline, who was a professional agent, dissembling by nature and not necessarily immorally in his scheme of ethics as an agent, and then the Jack Soble who for reasons of his own decided to tell what he knew to the United States Government." Deposition of John Barron at 73.

17. *Id.* at 72–73.

18. Barron observes in his deposition that any information concerning Wolston the Government possessed in 1951 could not have come from Soble, who was arrested in 1957, *id.* at 71–72, and that the report, at page 24, makes no mention of Soble in categorically identifying Wolston as a Soviet agent, *id.* at 68–72. Of course, all of the Government's information concerning Wolston may have come indirectly through Soble, *e.g.* through Boris Morros in 1951.

19. Affidavits of Al Silverman, Vice President and Editorial Director of Book-of-the-Month Club, Inc.; William Houghton, President of MacMillan Book Clubs, Inc.; Marcus Jaffe, Senior Vice President and Editorial Director of Bantam Books, Inc.

20. Brief for Defendants at 17 n. 45.

## II. FIRST AMENDMENT RESTRICTIONS ON LIBEL LAWS

In determining the standard of fault that applies in a libel action, courts must strike a balance between First Amendment values, on the one hand, and the states' concern for protecting the reputations of their citizens, on the other. The Supreme Court in recent years has said that insofar as "public officials" and "public figures" are concerned, the balance must be struck in favor of the freedoms of speech and press. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Because would-be critics and commentators need "breathing space," or margin for error, if debate over "public issues . . . [is to] be uninhibited, robust, and wide-open," *New York Times, supra,* 376 U.S. at 270, 84 S.Ct. at 721, libel plaintiffs who quality as public officials or public figures must satisfy an exceptionally demanding burden of proof. They must establish with "convincing clarity" that the allegedly libelous statements concerning them were made with "actual malice"— that is, actual knowledge of falsity or reckless disregard for the truth. *Id.* at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29. In *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality of the Court went still further, concluding that the Constitution accords similar protection to criticism of *private* individuals who become involved in areas of public interest.

In recent decisions a majority of the Supreme Court has made clear its determination that the *Rosenbloom* plurality failed, for constitutional purposes at least, to allow the states sufficient latitude to protect private individuals from libel. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that the Constitution does not compel application of the *New York Times* standard in a libel suit brought by a "private individual." Rather, the states' legitimate interest in protecting the reputations of private individuals is strong enough to justify permitting such persons to recover damages from publishers or broadcasters under any standard short of liability without fault. 418 U.S. at 339–48, 94 S.Ct. at 3006–3011. The Court reiterated and applied this "public figure-private individual" distinction in *Time Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

In the present case much of the dispute centers on the meaning of *Gertz* and *Firestone* insofar as those decisions bear on the question whether Ilya Wolston qualifies as a public figure. Unfortunately, the line between "public" and "private" libel plaintiffs is not altogether clear, *see Firestone,* 424 U.S. at 484–93, 96 S.Ct. at 979–84. (Marshall, J., dissenting), and the question here has therefore proved difficult to resolve. To do so, the court has had to consider carefully the reasons why petitioner Gertz and respondent Firestone were found to be private individuals, not public figures.

The facts in *Gertz* are these: After a Chicago policeman was convicted of murder, the victim's family retained petitioner Gertz, a reputable attorney, to represent them in civil litigation against the convicted policeman. Respondent's magazine then printed an article alleging that the prosecution had gained a conviction of the policeman on the basis of false testimony, that the murder trial was part of a Communist plan to discredit the police, that Gertz had participated in designing the "frame-up," and that Gertz served as a "Communist-fronter" and had a criminal record. In fact, the Court noted, Gertz had played no part whatever in the policeman's criminal trial and had no record of his own. He did attend the coroner's inquest into the boy's death but never discussed either the criminal or civil litigation with the press. 418 U.S. at 352, 94 S.Ct. 2997.

Justice Powell's opinion for the majority of the Court recognizes two categories of public figures: [21]

---

21. In *Curtis Publishing Co. v. Butts,* and its companion, *Associated Press v. Walker,* 388

U.S. 130, 154–55, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), Justice Harlan had also recognized

"In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

418 U.S. at 351, 94 S.Ct. at 3013. Although this language suggests that a person can become a public figure by being "drawn into" the public view, elsewhere in the opinion the Court made clear its emphasis on purposeful activity by which a person can be said to have breached his privacy himself and thereby to have increased the risk to his reputation:

"Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. . . .

. . . [P]ublic figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them."

418 U.S. at 345, 94 S.Ct. at 3009. Gertz, reasoned the Court, clearly did not qualify as a public figure for all purposes since he had achieved no general fame or notoriety in the community. *Id.* at 351–52, 94 S.Ct. 2997. Moreover, the "nature and extent of . . . [Gertz's] participation in the particular controversy giving rise to the defamation" failed even to qualify him as a public figure for a limited range of issues. *Id.* at 352, 94 S.Ct. at 3013. Since he played no part in the criminal prosecution, never communicated with the press regarding either the criminal or civil litigation, and, essentially, participated in the controversy

only to the extent necessary to represent his clients' interests, he "plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id.* Thus, under the Court's rationale, it would be improper to conclude that he had "relinquished . . . [any] part of his interest in the protection of his own good name." *Id.* at 345, 94 S.Ct. at 3010.

In *Firestone,* the Court's most recent decision concerning the line between public figures and private individuals, respondent was the wife of the scion of one of America's wealthiest industrial families. In determining that she did not qualify as a public figure, even for the limited range of issues relating to her highly publicized divorce proceeding,[22] the Court emphasized the absence of "voluntariness" as its basis for concluding that respondent had not sacrificed her interest in protecting her reputation. For the privilege to attach, the Court reasoned, the defamatory communication must concern a "public controversy;" but respondent's divorce proceeding, albeit an object of curiosity, was not the sort of controversy the Court had in mind. 424 U.S. at 454, 96 S.Ct. 958. Moreover, said the Court, the allegedly defamed individual must have voluntarily exposed herself to increased risk of defamatory injury; but for respondent, "resort to the judicial process . . . [was] no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court." *Id.,* quoting from *Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 785, 28 L.Ed.2d 113, 117 (1971). Rather, if she was to obtain separate maintenance, she had no choice but to go to court. 424 U.S. at 454, 96 S.Ct. 958. And even though she had held press conferences during the much publicized divorce proceeding, "she did not thrust herself to the forefront of any par-

two categories of public figures—those who command a substantial amount of independent public interest at the time of the publications, attained through position alone or by purposeful activity amounting to a thrusting of one's personality into the vortex of an important controversy.

22. After Mrs. Firestone sued her husband for separate maintenance, her husband filed a counterclaim for divorce. The Florida Supreme Court characterized the trial as a "cause célèbre." 424 U.S. at 454, 96 S.Ct. 958.

ticular public controversy in order to influence the resolution of the issues involved in it." *Id.* at 453, 96 S.Ct. at 965.

## III. APPLICABILITY OF THE CONSTITUTIONAL STANDARD

Ilya Wolston apparently led a thoroughly private existence and was generally unknown before receiving his first subpoena, early in 1957, and after that as well, until his failure to appear before the special grand jury became public knowledge. After the flurry of publicity attending his conviction ceased, he apparently succeeded, for the most part, in resuming his private ways. Accordingly, defendants make no claim that his contempt conviction achieved for him pervasive fame or notoriety[23] or that he wields the sort of power and influence that would otherwise qualify him as a public figure for all purposes and in all contexts. Rather, the question here is whether Wolston's failure in 1958 to testify before the grand jury investigating espionage and his resultant contempt conviction qualify him as a public figure for a limited range of issues. As defendants have put it, the question is whether Wolston is a public figure for purposes of comment on his connection with, or involvement in, Soviet espionage in the United States.

Wolston derives from *Gertz* and *Firestone* the proposition that only a select few libel plaintiffs qualify for constitutional purposes as "limited-issue" public figures. Those, he says, are people who have purposefully sought the public's attention in order to sway public opinion; people who have "mounted a public rostrum, made an appeal to the public, sought or received

public funds, offered a service or product for public use or comment, or organized a boycott or other group activity by other members of the public." *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App.D.C. 70, 366 F.2d 649, 658 (1966). But the last thing Wolston wanted, according to him, was to engage the public's attention or to influence anyone in any way whatever. Relying on language in *Gertz,* Wolston contends "he has never thrust himself to the forefront of any controversy. Nor has he had the power of influence to resolve any public debate." Brief for Plaintiff at 10. Moreover, he claims, *Firestone* "made it clear that merely being a party to civil litigation or being brought before the court as a criminal defendant does not work a metamorphosis transforming a private person into a public figure." Brief for Plaintiff at 11. In this connection Wolston observes that his "first and only public appearance" occurred in a courtroom and that he appeared there only "at the behest of the state." *Id.* at 10–12. He also claims that even if his actions in 1958 did qualify him as a public figure for purposes of comment at the time, it can scarcely be said that he was in any sense a public figure in 1974, when defendants published *KGB.* Finally, he reasons, the privilege is designed to protect reporters and the news media, not defendants such as these who had ample time to investigate any potentially libelous statements they intended to publish.

The court finds Wolston's arguments eloquent and well-reasoned.[24] It cannot agree, however, with his literal, restrictive interpretations of *Gertz* and *Firestone.* To be sure, those cases narrow the privilege

---

**23.** In assessing Wolston's "notoriety," this court limits itself to consideration of his contempt conviction and subsequent coverage of that conviction. For if, as Wolston contends, allegations that he was a Soviet agent are libelous, then any notoriety springing from those allegations has no bearing on the issue here. The Supreme Court's decisions require purposeful activity on plaintiff's part; thus libel alone—particularly the very libel on which a lawsuit is based—cannot rob a person of his status as a private individual.

**24.** Wolston's conceptualization of a public figure is appealing, since the people he describes—individuals with power to attract the public's attention in order to influence the resolution of important issues—are, but for lack of public office, similar to public officials. Thus it is easy to conclude that they can claim a lesser interest in protecting their reputations than that of private individuals. The public has an intense interest in knowing about such people in order better to assess the positions they espouse, and the media therefore require "breathing space" in criticizing them.

articulated by the plurality in *Rosenbloom.* Indeed, the Supreme Court has seen fit to turn inside out the rule espoused in *Rosenbloom* by concluding that private individuals generally do *not* become public figures solely by virtue of involvement, however slight, in matters of general or public concern. Nevertheless, this court is not convinced that the Supreme Court means to limit public-figure status to persons with power and influence or, for that matter, even to persons who have purposefully sought to engage the public's attention. Rather, as the Court said in *Gertz,* "[it] is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. at 3013. *See also Ryder v. Time, Inc.,* Civil No. 76–1909 (D.C.Cir.1976) slip opinion at 5. And the nature of an individual's participation might be significant, and the extent substantial, whether or not he actually craves the public's attention or wields power and influence. Thus, for example, one individual might seek to remain a recluse, and yet, by virtue of his power and influence, qualify as a public figure. And by the same token, a virtual nonentity desiring no attention at all may, by engaging in activity that appears to affect the public's well-being, qualify as well. In each

case the public has a legitimate interest in knowing about the individual's activities, and he can be said to have sacrificed a measure of his interest in protecting his reputation. For there are many ways by which a person can "mount the public rostrum," and when one does so the privilege must arise. This is so because we have embraced a "profound national commitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open," *New York Times, supra,* 376 U.S. at 270, 84 S.Ct. at 721 (emphasis added); and because that debate necessarily encompass discussion about the activities of individuals who assume central or prominent roles in the unfolding of those issues.

■ In this court's opinion, *Gertz* contemplates two principal considerations in determining whether a person qualifies as a limited-issue public figure.[25] First, the plaintiff must have become involved in a "public controversy;"[26] if he has not done so, the First Amendment interest at stake is insubstantial. Although the Supreme Court has not explained exactly what it means by this concept,[27] *Firestone* seems to indicate that matters which are essentially private, such as the issues in a divorce proceeding, do not become public for purposes of libel law solely because they are aired in a public forum.[28] Thus, although divorce itself may be an important subject of de-

25. *See Martin Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947 (D.D.C.1976).

26. In *Gertz* the Court rejected the *Rosenbloom* plurality's determination that "public concern" constituted a sufficient basis for mandatory application of the actual malice test. In both *Gertz* and *Firestone,* however, the Court seemed to regard a "public controversy" as a prerequisite for mandatory application of the test—that is, there must exist a controversy into which the putative public figure can have thrust himself.

27. The Court has employed similar language on several occasions. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), Justice Harlan spoke of an "*important* controversy," but provided no criteria for gauging "importance." *Id.* at 155, 87 S.Ct. 1975 (emphasis added). In *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the plurality spoke of areas of "*general or public interest,*" but provided no stan-

dards for measuring that "interest." *Id.* at 43, 91 S.Ct. at 1819 (emphasis added). In *Gertz,* the Court sought to relieve courts of the responsibility for determining the public interest in the context of libel suits, but nonetheless referred to a "public figure" as an individual who involves himself in a "*public controversy.*" 418 U.S. at 351, 94 S.Ct. 2997. In *Firestone,* the Court provided little further guidance, saying only that "[d]issolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." 424 U.S. at 454, 96 S.Ct. at 965.

28. The Court said that *Gertz* "should make it clear that no such blanket privilege for reports of judicial proceedings is to be found in the Constitution." 424 U.S. at 456, 96 S.Ct. at 966.

bate, discussion of the details of particular divorces generally does little to advance that debate and therefore does not require the degree of insulation from suit accorded by the standard in *New York Times.* Simply stated, it is not necessary to treat every participant in a divorce proceeding as though he or she were a public figure. Second, the plaintiff's involvement in the controversy must have been in some sense voluntary, as well as significant. The Constitution, according to the Supreme Court, respects the states' interest in protecting the reputation of a person who has done nothing—or very little—to sacrifice it himself. Rarely, therefore, does the Constitution require the states to attach public-figure status to the mere act of entering the doors to the courthouse. For most litigants, like respondent Firestone, have no other means of obtaining redress; if she wanted separate maintenance, she had no alternative but to go to court.[29] And petitioner Gertz, by providing counsel to the victim's family, played at most a supporting role in the controversy over the conduct of Chicago's police. Neither of them, according to the Court, sacrificed any interest he otherwise had in protecting his reputation.

▮ It is the court's opinion that Ilya Wolston does qualify under *Gertz* and *Firestone* as a public figure [30] for the limited purpose of comment on his connection with, or involvement in, espionage in the 1940's and '50's. This is so essentially because he involved himself in the espionage controversy in a way that unquestionably invited attention and comment. Indeed, a contempt conviction for failure to appear before a grand jury investigating espionage invites press and public alike to ask the very questions which the alleged libel in this case purports to answer, namely: "Why did he fail to appear? What was his connection with the investigation?" Refusal to extend the constitutional privilege to answers to those questions which the press believes to be true (or about which it has no serious doubts) would serve to muzzle, rather than to encourage, the debate which the First Amendment is designed to foster.

▮ Applying the considerations articulated in *Gertz* and *Firestone*, the court has no doubt whatsoever that espionage qualifies as a "public controversy," however that concept might be defined. For the issues espionage embraces are public ones in every respect. This is so not merely because of the importance of the subject to the public; this is so also because full airing of the subject necessarily requires discussion of the activities of the particular people who involved themselves with espionage in a significant way. And the list surely includes people convicted of contempt in an espionage setting, as well as people convicted of espionage itself. Moreover, although the question is a more difficult one,[31] the court is persuaded that, in choosing not to appear before the grand jury, Wolston breached his privacy himself and thereby

---

**29.** The Supreme Court's opinion proceeds on the assumption that Mrs. Firestone had no alternative: "Nor did respondent freely choose to publicize issues as to the propriety of her married life." 424 U.S. at 454, 96 S.Ct. at 965.

**30.** The court notes that it regards the determination of public-figure status as a question of law, which the court, not the jury, must resolve. In *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1965), the Supreme Court observed that, "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'" *Id.* at 88, 86 S.Ct. at 677. "Such a course will both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court the record and findings required for review of constitutional decisions." *Id.* at 88 n. 15, 86 S.Ct. at 677. In accord in the public-figure context, *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440 (S.D.Ga.Sav. Div.1976); *Hotchner v. Castillo-Puche*, 404 F.Supp. 1041 (S.D.N.Y.1975).

**31.** In *Anderson v. Stanco Sports Library, Inc.*, 542 F.2d 638 (4th Cir. 1976), the court, noting the complexity of the issue, managed to avoid determining whether a convicted murderer qualifies as a public figure. *Compare Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440 (S.D.Ga.Sav.Div.1976), where the court based a finding that Tony Rosanova is a public figure on his alleged underworld involvements and his contacts with the Teamster's Union.

relinquished a measure of his interest in protecting his reputation. To be sure, he probably would have preferred not to have become involved in the controversy in the first place; a subpoena interrupted his private existence in Washington, D.C. But the subpoena did not require Wolston to appear in public; on the contrary, compliance with it might have enabled him to have preserved his anonymity.[32] In choosing not to comply, Wolston knew, or certainly should have known, that he would attract attention—again, precisely the sort of attention that he challenges in this case.[33] He cannot now be heard to complain that someone noticed him, unless he can prove actual malice. For answers to the questions raised by Wolston's conviction, whether right or wrong, fall within the ambit of the constitutional privilege.

**32.** Grand jury proceedings are insulated from the public's view. . See Rule 6(e), Fed.R. Crim.P., which continues the traditional practice of requiring participants in grand jury proceedings, with the exception of witnesses, to refrain from discussing those proceedings with the public. Secrecy has long been the federal policy and was the rule at the time of Wolston's contempt trial. *See, e.g., Goodman v. United States*, 108 F.2d 516 (9th Cir. 1940). Thus it would be incorrect to say that Wolston was compelled—by the subpoena at least—to appear in a public forum. Accordingly, from January 1, 1957 to June 30, 1958, the period in which he testified on several occasions before the grand jury, he apparently received no publicity at all. Deposition of Ilya Wolston at 62–72.

**33.** In Wolston's affidavit he describes extenuating circumstances, such as problems with his health, which he claims bore on his failure to travel to New York to testify on July 1, 1958. From this evidence the court could infer that Wolston's decision not to appear was in some sense involuntary, that in fact he had no desire whatever to sacrifice the grand jury's cloak of secrecy but was forced to do so by circumstances beyond his control. In Defendant's Reply Memorandum they seek in turn to show that Wolston intentionally thwarted the Government's investigation, and go so far as to submit an affidavit that an Assistant United States Attorney executed in 1958 in support of the Government's motion to hold Wolston in contempt.

The court is not persuaded that such considerations have any bearing on the issue before it. For one thing, the federal judge who accepted Wolston's guilty plea presumably passed on the question of "voluntariness," and this court sees no reason why it should examine his findings. More importantly, the court is persuaded that "subjective" or actual voluntariness ought not to be a factor in the determination whether a particular libel plaintiff qualifies as a public figure. As the Supreme Court observed in *Gertz*, "the communications media are *entitled to act on the assumption* that . . public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." 418 U.S. at 345, 94 S.Ct. at 3010 (emphasis added). And inasmuch as the media have no way of ascertaining with certainty—much less of proving—the actual thought processes of a putative public figure but instead must rely on objective indicia of his intentions, and the public's interest in knowing about his activities might be substantial regardless of his intentions, the standard must be an objective one. The concept of breathing space is simply incompatible with a test that forces the media either to comprehend a person's motives, or to refrain from commenting on his actions. Normally, then, in the context of the First Amendment the press must be entitled to assume that an individual's acts are voluntary unless it has good reason to believe otherwise. If, moreover, an individual engages in activity that reasonably appears to constitute a breach of his privacy and to involve him in a controversy that is essentially public in nature, the privilege will arise. To be sure, these concepts are general at best and the press might find it difficult to resolve the questions they raise in particular cases. Nevertheless, the distinctions between *Firestone* and Wolston's case seem fairly clear. In *Firestone*, which the Court saw fit to treat essentially as an "ordinary" divorce, the Court determined that an individual ordinarily does not sacrifice any part of his interest in protecting his reputation simply by bringing a marital dispute to court. As suggested previously, such disputes involve issues that are essentially private in nature, and the participants have no other means of seeking relief. By contrast, it is not difficult to conclude that Wolston did sacrifice a measure of his interest in protecting his reputation by subjecting himself to contempt charges and pleading guilty. In no sense did the Government compel him to remain at home on July 1, 1958. He might instead have chosen to comply with the subpoena or, like respondent Firestone, to go to court to vindicate whatever right he may have had not to comply with it. When he failed to choose either of these alternatives, he became involved in a controversy of a decidedly public nature in a way that invited attention and comment, and thereby created in the public an interest in knowing about his connection with espionage that outweighed his competing interest in remaining anonymous.

As the Supreme Court has observed repeatedly, the freedoms of speech and press embodied in the First Amendment could not be fully realized and preserved if the press were obliged either to guarantee the truth of its assertions, or to refrain from making them.

■ Wolston's other arguments—that he is no longer a public figure and that the privilege belongs only to the press, not to the authors and publishers of a book—are unavailing. Surely historical comment on the espionage-related activities of Wolston and others who became involved in the controversy during the 1950's requires just as much protection as did media coverage of the events as they occurred. The Constitution does not confine debate on public issues and the roles of people involved in them to discrete and brief periods of time.[34] Moreover, the need hurriedly to print "hot news"[35] is but one of the rationales supporting the public-figure concept. Authors and publishers of books, like their news-media counterparts, are simply unable to guarantee the truth of each and every word they print.[36] To be sure, they may well have greater opportunity to investigate the truth of their assertions, and this might bear on a finding of actual malice. But to impose on them the burden of acting as would a reasonably prudent person under the circumstances—under either a negligence or gross negligence standard—would doubtless lead to destructive self-censorship. For reasonable people might differ about the amount of time, money, and manpower necessary to complete an adequate investigation, and these differences could become either the bases for a host of lawsuits or for decisions not to publish. Insofar as public figures are concerned, the Constitution accords breathing space to publishers in order to avoid these results and, instead, to encourage publishers not to refrain from printing criticism unless they know it is false or have serious doubts about the truth of it.[37]

**34.** In *Brewer v. Memphis Pub. Co., Inc.*, 538 F.2d 699 (5th Cir. 1976), the court of appeals observed that the Supreme Court's decisions leave open the question whether a "person who has been a public figure in the past can retreat to private status and obtain the benefit of the lesser standard of proof required for damages for injury from libel." *Id.* at 703. The court of appeals remanded the case to the trial court to resolve this issue as well as others.

However, in *Time v. Johnson*, 448 F.2d 378 (4th Cir. 1971), the court stated that:

"Mere passage of time will not necessarily insulate from the application of *New York Times v. Sullivan*, publications relating to the past public conduct of a then "public figure." No rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such public career." *Id.* at 381.

**35.** The "hot news" rationale is misleading. This is so because the argument that the press must act quickly (and therefore lacks time to investigate) while the author of a book has plenty of time (and therefore can investigate extensively) seems, at first blush, to be a persuasive reason for requiring authors of books to act reasonably, or at least not too unreasonably. But the argument misses the point. Indeed, were "hot news" the only, or even the dominant, consideration, even *New York Times* might have been decided differently. There is nothing inherently unreasonable about quick decisions; the Court might have decided to require the press simply to conduct a reasonable investigation under the circumstances, e.g. the time available, the risk to reputation, and so on. Instead, the Court saw fit to require no investigation whatsoever in *New York Times*, a case involving an advertisement, not a "hot news" item.

The point, very simply, is that the strictures of objective reasonableness are incompatible with vigorous commentary on the public activities of public officials and public figures, whether the commentator is the press or the author of a book.

**36.** In *Meeropol v. Nizer*, 381 F.Supp. 29 (S.D.N.Y.1974), the court found that the sons of Julius and Ethel Rosenberg were public figures notwithstanding the fact that the children had "renounced the public spotlight by changing their name." *Id.* at 34. The alleged libel appeared in Nizer's book *The Implosion Conspiracy*, yet the court's opinion makes no mention of the question whether authors and publishers of books can claim the protection afforded by the actual-malice standard. Implicitly, of course, the court resolved that question in favor of the defendants.

**37.** The court might also have decided to apply the actual-malice standard in this case on the ground that the law in the District of Columbia requires it. In *Hatter v. Evening Star Newspaper Co.*, Civil No. 8298–75 (Sup.Ct.D.C. March

## IV. APPLICATION OF THE CONSTITUTIONAL STANDARD

The court of appeals for this jurisdiction has observed that summary procedures are especially appropriate in the First Amendment area, *Washington Post Company v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). For the *New York Times* principle is designed in part to avoid the "chilling effect" on freedom of speech and press that inheres in the threat of being put to the defense of a lawsuit. *Id.; see also Dombrowski v. Pfister,* 380 U.S. 479, 487, 88 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Accordingly, defendant's motion should be granted if plaintiff is unable to establish clearly and convincingly that defendants acted with actual malice. *See, e.g., Miller v. New Syndicate Co.,* 445 F.2d 356 (2d Cir. 1971); *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858 (5th Cir. 1970); *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

The Supreme Court has dealt with the concept of actual malice on a number of occasions, and the concept is now well-defined. Thus, actual malice is quite different from common-law malice, which is generally required under state tort law to support an award of punitive damages and which focuses on the defendant's attitude toward the plaintiff. Actual malice focuses instead on the "defendant's attitude . . . toward the truth or falsity of the material published." *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 252, 95 S.Ct. 465, 470, 42 L.Ed.2d 419 (1974); *Time, Inc. v. Hill,* 385 U.S. 374, 396 n.12, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). In *New York Times* the Court defined the requisite attitude as either knowledge that the statement was false or reckless disregard for the truth or falsity of the statement. 376 U.S. at 280, 84 S.Ct. 710. In subsequent cases the Court has made clear that the issue focuses on the defendant's state of mind. In *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), the Court stated that plaintiff must demonstrate a "high degree of awareness of . . . probable falsity." And in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court observed:

> "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

*Id.* at 731, 88 S.Ct. at 1325 (emphasis added).

The record in this case fails to demonstrate clearly and convincingly that Barron or any of his co-defendants entertained serious doubts or, for that matter, any doubts about the truth of the statements in *KGB* that connect Wolston with espionage. Rather, Barron has stated under oath that he "was confident upon publication of *KGB* that the book as a whole and each and every statement in it were true, and . . . was aware of no fact that tended to make . . . [him] doubt the truth of the book or of any statement in it, Affidavit of John Barron at 2; and the record contains scarcely any evidence at all tending to impeach Barron's assertions. To be sure, sworn-to reliance on a report by the F.B.I.

15, 1975), a Superior Court Judge observed that state courts may, under *Gertz,* establish lesser standards of fault in libel suits and nevertheless saw fit to embrace the *New York Times* standard in a suit concerning a "private individual" who became involved in a matter of "public concern." Surely Wolston would be required to prove actual malice under this test. And whether or not the *Erie* doctrine is mandated in diversity actions brought in the District of Columbia, *see Martin Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947, 957 n.9 (D.D.C.1976); *Luck v. Baltimore & Ohio R.R.,* 352 F.Supp. 331, 334 (D.D.C.1972), or in an area of substantive law to which the highest state court has not spoken, this court, believing that the Superior Court has adopted the best available rule, would have followed that court's lead were it necessary to do so.

might seem, in light of events in recent years, to be risky business. But reliance on an F.B.I. report, absent an independent basis for entertaining serious doubts about its accuracy, falls far short of the level of questionable activity necessary to raise a genuine issue with regard to actual malice. *Compare, e.g., Carson v. Allied News Co.,* 529 F.2d 206 (7th Cir. 1976); *Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F.Supp. 421 (D.D.C.1972). *See also Briscoe v. Reader's Digest Association, Inc.,* No. LTL 71–245 (C.D.Cal.1972) (unpublished order granting summary judgment to defendants who relied on an F.B.I. report of a hijacking incident involving plaintiff Briscoe). And Barron's knowledge of Soble's reputation as a liar is too slender a reed to support a judgment in Wolston's favor. Without reference to Soble the F.B.I.'s report categorically identifies Ilya Wolston on page 24 as a "Soviet intelligence agent;" at page 26 the report states that the Government had information supporting "the probable identification of Wolston as a Soviet agent" as early as 1951, well before Soble was arrested. And in any case, even if Soble was directly or indirectly the Government's only source of information concerning Wolston, Barron knew that, *after* Soble was arrested, he provided information to the Government that proved "extremely useful and . . . quite reliable in many cases." Deposition of John Barron at 73. Moreover, and perhaps most important, despite the fact that Barron devoted over four years to researching and writing *KGB,* and did so with the assistance of a sizeable research staff, *id.* at 45–48, not a shred of evidence emerged suggesting that Wolston had ever objected to the assertions about him in Morros's book, published in 1959, or in the F.B.I.'s report, published in 1960.[38] Under the circumstances, the court is satisfied not only that Barron did place his faith in the accuracy of the report, but also that he had ample reason to do so notwithstanding his awareness of the reputation for

untrustworthiness which Soble had earned while acting as an undercover intelligence agent.

The court agrees with Wolston that the footnote at page 188 of the Reader's Digest edition of *KGB* appears to state falsely that he was indicted for espionage. Nevertheless, the statement is ambiguous; Barron's explanation of it is plausible and, in the court's opinion, offered in good faith. *See St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 267 (1968); *Time Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). In such circumstances this court has recently said:

> "In the absence of any proof, other than the document itself, that defendants entertained serious doubts about the possibility of a defamatory interpretation, plaintiff's case is not one of 'convincing clarity,' as is constitutionally required. The language in the editorials, itself ambiguous and susceptible of different interpretations, cannot render the defendants' statements of good faith belief 'so inherently improbable that only a reckless man would have so worded the editorials.'"

*Buckley v. Washington Post Co.,* Civil No. 74–1203 (D.D.C. June 29, 1976), slip opinion at 7. Thus, even though the court in *Buckley* agreed with plaintiff that the publication in question there was susceptible to a defamatory interpretation, it granted summary judgment to the defendants. For the publication did not "unambiguously state . . . the contrary of what defendant said he meant," *id.* at 9, and therefore could not by itself support a finding of actual malice. That principle is applicable here as well.

Finding no genuine issue raised with respect to actual malice on Barron's part, the court must grant his motion for summary judgment. The court must also grant summary judgment to each of the other defendants, since there is no basis in the record for

---

**38.** In his deposition Wolston states that he learned of the F.B.I.'s report only recently, was unaware of Morros's book until the late 1960's and remained silent about the latter out of concern for making matters worse. Deposition of Ilya Wolston at 91. None of this has any bearing, of course, on Barron's belief that the F.B.I.'s report is accurate.

concluding that any of them had serious doubts about the truth of the statements they published concerning Wolston.

It is so ordered.