Ilya WOLSTON, Appellant,

v.

The READER'S DIGEST ASSOCIATION, INC., d/b/a Reader's Digest Press, et al.

No. 77-1329.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1978.

Decided May 23, 1978.

Sidney Dickstein, Washington, D. C., with whom Stephen G. Kozey, Washington, D. C., was on the brief for appellant.

John J. Buckley, Jr., Washington, D. C., with whom John W. Vardaman, Jr., Washington, D. C., was on the brief for appellees.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

In this action for libel Ilya Wolston sues the author, John Barron, and the publishers of a book entitled "KGB: The Secret Work of Soviet Secret Agents". The defendant The Reader's Digest Association, Inc. (Reader's Digest) is the initial publisher and the defendants Bantam Books, Inc., Book-of-the-Month Club and MacMillan Book Clubs, Inc., are subsequent publishers under contract arrangements with Reader's Digest. The District Court granted summary judgment for the defendants. *Wolston v. Reader's Digest Ass'n,* 429 F.Supp. 167 (D.D.C.1977).

Wolston is the nephew of one Jack Soble who in April 1957, in United States District Court for the Southern District of New York, pled guilty to an indictment charging espionage. On the same day his wife Myra Soble also pled guilty to this offense. In October 1957 they were sentenced to the penitentiary.

The grand jury's investigation of espionage continued after the indictment of the Sobles. Wolston was subpoenaed to appear before the grand jury in New York and he did appear on several occasions. On July 1, 1958 he failed to appear. As a result, in August 1958, he was charged with criminal contempt and on his plea of guilty was placed on probation for three years conditioned on his being available to process of the court within that period. The contempt proceeding generated some fifteen newspaper stories in the District of Columbia, where Wolston lived, and in New York. Thereafter, in 1959, Wolston's name appeared in a book entitled "My Ten Years As a Counterspy", written by Boris Morros, a former confederate of Soble. According to Morros, Soble identified Wolston to him as a Soviet agent who had furnished Soble information. Wolston was also identified as a Soviet agent in an FBI Report "Expose of Soviet Espionage", published in 1960 by the Senate Internal Security Subcommittee of the Committee on the Judiciary, United States Senate.

*KGB* was first published in January 1974. The alleged libel appears in the following passage in *KGB* referring to disclosures by "royal commissions in Canada and Australia, and official investigations in Great Britain and the United States":

Among Soviet agents identified in the United States were Elizabeth T. Bentley, Edward Joseph Fitzgerald, William Ludwig Ullmann, William Walter Remington, Franklin Victor Reno, Judith Coplon, Harry Gold, David Greenglass, Julius and Ethel Rosenberg, Morton Sobell, William Perl, Alfred Dean Slack, Jack Soble, *Ilya Wolston,* Alfred and Martha Stern.\*

\* No claim is made that this list is complete. It consists of Soviet agents who were convicted of espionage or falsifying information or perjury and/or contempt charges following espionage indictments or who fled to the Soviet bloc to avoid prosecution. [Emphasis supplied] [1]

The District Court granted summary judgment for the defendants upon the ground that Wolston was a public figure for the limited purpose of comment on his connection with, or involvement in, espionage, and that the evidence raised no genuine issue with respect to the existence of actual malice on the part of the defendants. We affirm.

## PUBLIC OR PRIVATE FIGURE—A QUESTION OF LAW

■ The District Court held that whether Wolston was a public figure was a question of law, to be decided by the court. Wolston contends that in this the court erred because "this complex factual question . . . . whether plaintiff is a public figure is properly a jury matter." We think the District Court was right. In *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) the Court remarked that "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official'". We think the same rule should be applied when the question is whether a plaintiff is a "public figure". The Court observed "[s]uch a course will both lessen the possibility that a jury will

1. Wolston also complains of the index to the book which lists him as Wolston, Ilya, Soviet Agent in U. S.

2. A judgment for the plaintiff in this case was reversed but the District Court's ruling on his

use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court the record and findings required for review of constitutional decisions." 383 U.S. 88, n.15, 86 S.Ct. 677. We add that a jury of laymen is hardly qualified to apply the nice and sometimes intricate distinctions between public and private figures which have been developed in the cases following *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Application of those rules and distinctions is analogous to a court's ruling on the question of probable cause for a search and seizure, a matter which of course is for the court and not the jury. We note furthermore that counsel is unable to cite any case in which a jury has been permitted to decide whether a plaintiff, as a matter of "constitutional fact", is a public figure. On the contrary, the question has always been held to be one for the court. *See Hotchner v. Castillo-Puche,* 404 F.Supp. 1041, 1043–47 (S.D.N.Y.1975) (order denying summary judgment).[2]

Wolston argues that there was an issue of fact concerning his intention in failing to appear before the grand jury and in subjecting himself to a contempt proceeding. The issue he says was whether in so doing he intended to mount a public rostrum and to participate in the debate concerning espionage investigations. We conclude however that the undisputed facts demonstrate that he became a public figure, whatever his subjective intention might have been. We therefore turn to a consideration of the undisputed facts.

## WOLSTON A PUBLIC FIGURE

■ The plaintiff Ilya Wolston was born in Russia in 1918 and later lived in Lithuania, Germany, France, and England. In 1939 he came to the United States and in 1943 became a naturalized citizen. He was drafted into the United States Army in

status as a public figure was not disturbed. *Hotchner v. Castillo-Puche,* 551 F.2d 910, 911 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

1942, trained as a Russian interpreter, and served primarily in Alaska as a liaison to Soviet military personnel. After his discharge in 1946, he worked as an interpreter for the United States Military Government and the Department of State in Allied-occupied Berlin. On his return to the United States in 1951, Wolston first worked as a clerk, then enrolled in an undergraduate program, and in 1955 moved to Washington, D. C. to work for several months for the Army Map Service and finally as a freelance translator until 1957.

On January 25, 1957 Wolston's aunt and uncle, Myra and Jack Soble, were arrested on espionage charges by agents of the Federal Bureau of Investigation. They were indicted on February 4, 1957 on five counts charging espionage, conspiracy, and violation of the Registration Acts. In April 1957 Jack Soble pled guilty to espionage and was sentenced to imprisonment for seven years. On the same day the Sobles were arrested, Wolston was interviewed at his home by the F.B.I. Shortly thereafter he was subpoenaed to appear before a federal special grand jury convened in the Southern District of New York, to investigate the activities of Soviet intelligence agents in the United States. Wolston was interviewed by the F.B.I. on at least three more occasions in connection with the grand jury's investigation and he made trips to New York in response to subpoenas.

On July 1, 1958 Wolston failed to respond to a grand jury subpoena directing him to appear on that date. On July 14, 1958 a federal district judge ordered that Wolston show cause why he should not be held in criminal contempt of court. These events immediately attracted a significant amount of public attention and coverage by newspapers. On July 15 and 16, at least seven news stories were published in New York and Washington, D. C., newspapers, focusing on Wolston's failure to appear and the court's show cause order. The stories were headlined "Spy Inquiry Hunts Nephew of Soble," "Hunt Soble Kin for Spy Data," "Soble Nephew Facing Jail in Spy Quiz Snub," "Soble Nephew Faces Rap for Probe Dodge," "Court Calls Spy's Nephew," and "Kin of Soble Faces Quiz on Contempt." (App. 270–271, 273–275, 280–281) The stories reported statements by Assistant United States Attorney Herbert C. Kantor that Wolston had been in contact with the Sobles for a long time before their arrest in January 1957. Three of the stories reported a statement by Mr. Kantor that Wolston was believed to have material information about the espionage matters under investigation, described in one story quoting Kantor as a "general criminal conspiracy against the U. S." (App. 274) The stories noted that Wolston had served as an interpreter at the U. N. conference in San Francisco, for the military government in Germany and in the Office of the United States High Commissioner of Germany.

On July 29, 1958 at least two newspapers reported that the judge presiding at the contempt hearing commented that "there is no question in my mind that there was a studied attempt [by Wolston] to avoid [an] appearance before this grand jury." (App. 279, 284) Three newspaper stories reported Mr. Kantor's statement that Wolston had previously failed to appear in answer to five different subpoenas, each time submitting a doctor's certificate the day before his scheduled appearance. In the subsequent contempt proceeding, Mr. Kantor submitted an affidavit stating that Wolston had failed to appear on several prior occasions in response to subpoenas.

On August 7, 1958 Wolston pled guilty to the charge of criminal contempt of court, and on August 8, his guilty plea was reported in two newspapers. On August 13, Wolston received a one-year suspended sentence on his guilty plea, and he was placed on probation for three years on condition that he be available to appear before another espionage grand jury if one were convened. The following day, August 14, three newspapers reported the sentence and the probation terms. One headline read "Sets Soble Kin Free—If He'll Talk on Spies". (App. 277)

The District Court held that under the standards of *Gertz v. Robert Welch, Inc.,*

418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) and *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) Wolston qualified "as a public figure for the limited purpose of comment on his connection with, or involvement in, espionage in the 1940's and '50's". 429 F.Supp. at 176. [footnote omitted] We agree. By failing to appear before the grand jury Wolston invited public attention and comment. Until that failure occurred he enjoyed obscurity in the wings, but by subjecting himself to a citation for contempt he voluntarily stepped center front into the spotlight focused on the investigation of Soviet espionage. In short, by his voluntary action he invited attention and comment in connection with the public questions involved in the investigation of espionage. The reference to him in *KGB* related strictly to those issues, without intruding into his personal life or affairs. *Cf. Time, Inc. v. Johnston,* 448 F.2d 378, 381 (4th Cir. 1971). Any contention that his appearance on the stage was involuntary is conclusively answered by his conviction for contempt.

*KGB* was published in 1974, sixteen years after Wolston's appearance on the public stage in New York. He argues that even if he once was a public figure for a limited purpose the passage of time has restored him to the status of a private citizen. The District Court held however that "historical comment on the espionage-related activities of Wolston and others who became involved in the controversy during the 1950's requires just as much protection as did media coverage of the events as they occurred". 429 F.Supp. at 178. Again we agree with the District Court. The issue of Soviet espionage in 1958 and of Wolston's involvement in that operation continues to be a legitimate topic of debate today, for that matter concerns the security of the United States. The mere lapse of time is not decisive. *Meeropol v. Nizer,* 381 F.Supp. 29 (S.D.N.Y.1974), *aff'd,* 560 F.2d 1061 (2 Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). In the *Meeropol* case the plaintiffs were the children of Julius and Ethel Rosenberg who were executed in 1953 following a trial for espio-

nage. The District Court (Tyler, J.) held that in 1974 they remained public figures because as children of the Rosenbergs they had "spent much of their early years in the public spotlight." *Id.* at 34. The Circuit Court of Appeals agreed "that the Rosenberg sons are public figures. . . . In the course of extensive public debate revolving about the Rosenberg trial appellants were cast into the limelight and became 'public figures' under the *Gertz* standards." 560 F.2d at 1066.

## THE ABSENCE OF ACTUAL MALICE

Under the rule of *New York Times Co. v. Sullivan, supra,* the plaintiff may not recover for a defamatory falsehood unless he can show that it was published with "actual malice," that is with knowledge that it was false or with reckless disregard of whether it was false or not. This means that the defendants here were entitled to summary judgment unless Wolston, as a public figure, could show enough to go to a jury on the issue of actual malice. *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 35, 365 F.2d 965, 968 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *cf. Goldwater v. Ginzburg,* 261 F.Supp. 784, 788 (S.D.N.Y.1966). We therefore turn to the evidence before the District Court on this issue.

The defendant Barron devoted four years to the writing of *KGB.* He was assisted by the large Reader's Digest research staff with offices both in this country and abroad. It appears however that the statements about Wolston in *KGB* were based primarily upon the FBI report published in 1960, and to a lesser extent upon the book, "My Ten Years As a Counterspy," published in 1959.

The author of the book "My Ten Years As a Counterspy," Boris Morros, was a former Soviet espionage agent and confederate of Jack Soble who later became a double agent for the F.B.I. In the book, Morros identifies Wolston as a Soviet espionage agent in the United States. According to Morros, Soble told him that an individual

who had operated in Germany under the code name "Slava" had supplied Soble with information valuable to the Soviets. Morros states that in the fall of 1954 Soble identified Ilya Wolston as "Slava". "Slava" or Wolston is mentioned on eighteen pages in the book, but Morros adds that he knew nothing about Wolston's activities except what Soble, "a confirmed liar," told him. The book also recites that Wolston failed to respond to six subpoenas issued by a federal grand jury, that Wolston pled guilty to a contempt of court charge, and that he received a one-year suspended sentence. Approximately 12,500 copies of the hardcover edition of the Morros book were printed, and 141,000 copies of the paperback edition.

In May 1960 the Federal Bureau of Investigation prepared a report entitled "Expose of Soviet Espionage". By direction of the Attorney General the report was transmitted to the Subcommittee to Investigate the Administration of the Internal Security Act and other Internal Security Laws of the Committee on the Judiciary of the United States Senate and in July it was published by the Subcommittee. 13,000 copies of the Report were ordered to be printed. A section of the report entitled "Jack Soble Case" contains the following:

> In the early 1940's the FBI was conducting an intensive investigation into the activities of Vassili Zubilin (true name, Vassili Mikhailovich Zarubin), Third Secretary ·of the Soviet Embassy, Washington, D. C. Zubilin had entered the United States on December 25, 1941, with his wife, Elizabeth, and son, Peter. The investigation disclosed that Zubilin had been an important Soviet intelligence agent for many years. During 1934–1937 he was in the United States on several occasions utilizing an American passport fraudulently obtained under the name of Edward Joseph Herbert.
>
> The first break in the FBI investigation came when in the Spring of 1943, Zubilin, while under physical surveillance by the FBI, was observed to contact Boris Michael Morros, a motion-picture producer in Hollywood. After extensive investigation into the activities of Morros, he

was interviewed by the FBI in July, 1947, and admitted he was recruited by Zubilin for Soviet intelligence activities. Morros, thereafter, agreed to operate as a double agent against the Soviets under the direction of the FBI. Thus began an operation of intrigue which led to the expose of a Soviet espionage ring in New York City culminated by the arrest on January 25, 1957, by FBI Agents of Jack Soble, Myra Soble and Jacob Albam on charges of conspiring to commit espionage. In addition, *the FBI investigation resulted in identifying as Soviet intelligence agents,* Jane and George Zlatovski, who were indicted on July 8, 1957, charged with espionage conspiracy; Alfred and Martha Stern, who were indicted on September 9, 1957 on two counts charging espionage conspiracy; *Ilya Wolston,* who was charged with contempt for failing to appear before a grand jury and on August 7, 1958, pleaded guilty in the Southern District of New York; Mark Zborowski, who was indicted for perjury on April 18, 1958, as a result of his denial before the Federal Grand Jury that he knew Jack Soble; and Vassili Molev, an official attached to the Soviet Embassy, Washington, D. C., who was declared persona non grata, January 25, 1957. [Emphasis supplied]

> *Jack and Myra Soble*
>
> \*   \*   \*   \*   \*   \*
>
> Soble supervised activities of Soviet agents both in the United States and Europe; assigned them to recruit U. S. Government employees stationed abroad, to obtain information concerning military equipment and supplies; and has claimed to have obtained information concerning the number of atomic bombs stockpiled in the United States and the rate of atomic bomb production as well as photographs of atomic "bunkers" in which bombs were stored.

(App. 324).

In a section entitled "Ilya Wolston" the report states:

On several occasions beginning May 7, 1950, Jack Soble furnished Boris Morros with information concerning an individual he described as a U. S. Army Colonel in Germany who furnished him information under the code name "Slava," which was very valuable to the Soviets. It is noted that from October, 1949, until July, 1951, Wolston was employed by the U. S. High Commissioner of Germany in Berlin. In January, 1955, Soble identified his nephew, Ilya Wolston as "Slava." In addition, Jack Soble, pleading guilty in April, 1957, furnished information identifying Wolston as a Soviet agent who provided him information for the Soviets on several occasions beginning when Wolston was in a military camp, about 1943. Soble said Wolston gave him information concerning his assignments and names of four persons at the camp whom he believed could be approached by the Soviets.

*Information concerning the probable identification of Wolston as a Soviet agent was furnished to the Department of State in 1951,* together with data developed concerning his black market activities in Germany. The Department of State, on the basis of these data, dismissed Wolston from his employment in Berlin. [Emphasis supplied]

(App. 325, 326).

Barron testified on deposition that he "had read the Boris Morros book, which identifies Mr. Wolston as a Soviet agent in numerous pages. But for purposes of documentation, it was the Senate Report on which we relied". (App. 64) In an affidavit he swore "I was confident upon publication of *KGB* that the book as a whole and each and every statement in it were true, and I was aware of no fact that tended to make me doubt the truth of the book or of any statement in it. . . . At no time have I been aware of any fact that would give me reason to doubt the truth of the F.B.I. Report or of any statement in it." (App. 294–95) To meet this evidence of good faith and get to a jury Wolston was required to produce evidence that notwithstanding his asserted reliance upon the book and report Barron "in fact entertained seri-

ous doubts as to the truth of his publication" and recklessly disregarded whether it was true or false. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). As the Court put it in *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) it was necessary to show that the publication was made with a "high degree of awareness of . . . probable falsity."

To carry his burden Wolston contends that the facts justify the inference that Barron entertained serious doubts as to the truth of his statement that Wolston was a Soviet agent. First, Wolston says Barron knew that in his book Morros had characterized Soble as a "confirmed liar", and that Soble, an admitted spy, was therefore an unreliable source. Second, Wolston cites Barron's admitted failure to "check with the FBI or to make any other inquiry before labeling Wolston a Soviet agent, notwithstanding the fact that the capacity to make such inquiry was readily at hand." (Wolston Br. 31–32) We are not persuaded by these arguments.

It is apparent from the F.B.I. report that Soble's statements are not the only basis for the Bureau's conclusion that Wolston was a Soviet agent. Thus the report states that "[i]nformation concerning the probable identification of Wolston as a Soviet agent was furnished to the Department of State in 1951, together with data developed concerning his black market activities in Germany." (App. 325–26) The report states however that it was not until January 1955 that Soble identified his nephew as Slava; and Morros in his book (P. 196) says this disclosure was first made to him by Soble in the fall of 1954. Moreover, the plain intendment of the F.B.I. report, taken as a whole, is that the Bureau's investigation identified Wolston as a Soviet agent, without reference to Soble. As for the Morros characterization of Soble as a "confirmed liar" it must be remembered that Morros was speaking of Soble, the Soviet agent. Barron in his deposition explained:

I think we are speaking about, in a sense, two different people here—the

Jack Soble as a Soviet agent and still under Soviet discipline, who was a professional agent, dissembling by nature and not necessarily immorally in his scheme of ethics as an agent, and then the Jack Soble who for reasons of his own decided to tell what he knew to the United States Government.

(App. 86).

The F.B.I. report makes it plain that when Soble "decided [to] tell what he knew" to the government the F.B.I. considered him a credible witness; and it was reasonable for Barron to accept this expert evaluation of Soble's credibility. We think the characterization of Soble by Morros is too weak a reed to support an inference that Barron's reliance upon the report was reckless.

We reject the argument that Barron was reckless because he failed to make inquiry to verify the statements in the F.B.I. report. Failure to investigate does not itself establish bad faith or recklessness. *New York Times Co. v. Sullivan,* 376 U.S. 254, 287–88, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *St. Amant v. Thompson,* 390 U.S. 727, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In any event Barron was entitled to rely upon the report of the F.B.I., one of the great investigative agencies of the world, and to believe that the Bureau's investigative skill and resources far exceeded any that were available to him. Moreover, so far as the Soble case was concerned, the report bore upon its face intrinsic proof of its reliability. The report stated that the Bureau's investigation of the case identified ten individuals as Soviet intelligence agents. Eight of these persons were indicted for espionage or perjury and pled guilty, were convicted, or became fugitives. The ninth, an attache to the Soviet delegation to the United Nations, was declared *persona non grata* and left the country. The tenth was Wolston. Thus, the results demonstrated the validity of the Bureau's investigative conclusions. Furthermore, the extensive research conducted by Barron and his staff, over a period of four years, revealed no evidence that Wolston had ever objected to the state-

ments about him in the Bureau's report, or in the Morros book.

Finally Wolston contends that he was libeled by the footnote Barron appended to his list of "Soviet agents identified in the United States". As we have seen, the list includes Wolston. We repeat the footnote:

No claim is made that this list is complete. It consists of Soviet agents who were convicted of espionage or falsifying information or perjury and/or contempt charges following espionage indictments or who fled to the Soviet bloc to avoid prosecution.

Wolston says this note falsely states that he was convicted of espionage and supports "the proposition that Barron was operating with reckless disregard for truth or falsity." Barron testified on deposition that to him the note meant that Wolston "fell in the category of someone who was convicted of contempt of court following espionage indictments [of others], which raised matters about which he refused to testify". (App. 70) We must agree with Wolston that the second sentence of the note is imprecise and ambiguous, and might be read as an awkward and involuted statement that he was indicted; but we think it does not follow as a reasonable inference that in writing it Barron was reckless or acted in bad faith. Imprecision and ambiguity of expression are ills that sometimes afflict even careful and well-intentioned writers, including lawyers and judges. We think of E. B. White, commenting on a fuzzy passage in one of his essays: "the thing didn't come out as clear as I would have liked, but nothing I write ever does." E. B. White, Essays 87 (Harper & Row, New York, 1977).

## CONCLUSION

We hold that Barron was entitled to summary judgment upon the ground that Wolston was a public figure and that the evidence raised no genuine issue with respect to the existence of actual malice on his part. This conclusion applies also to the defendants Reader's Digest, Bantam Books, Inc., Book-of-the-Month Club and MacMillan

Book Clubs, Inc.  The judgments of the District Court are

*Affirmed.*[3]

3.  As an alternative ground for its decision the District Court in a footnote suggested that even if Wolston was not a public figure the "actual malice" standard of *New York Times Co. v. Sullivan* would still apply as a matter of District of Columbia law.  The court cited *Hatter v. The Evening Star Newspaper Co.*, Civ. No. 8278–75 (March 15, 1976) in the Superior Court of the District of Columbia.  In that case a judge of the Superior Court, granting summary judgment for the defendant in a libel case, stated, without elaboration or citation of authority:

> This Court concludes that the appropriate rule in this jurisdiction should be, and is, that a private individual involved in a matter of public concern may not recover in libel against a publisher, reporter or broadcaster who reports or comments on that matter, unless he proves by clear and convincing

evidence that the defendants have violated the "actual malice" standard set forth in *New York Times Company v. Sullivan*, 376 U.S. 254 (1964).

The court's statement appeared in a brief unpublished order which recited several other grounds for granting summary judgment.  Although we need not and do not decide whether this pronouncement is a definitive statement of District of Columbia law, we note that in a subsequent case, *Phillips v. Evening Star Newspaper Co.*, Civ. No. 9999–75 (June 30, 1977), 105 Daily Washington Law Reporter 1425, another judge of the Superior Court filed an elaborate opinion which concluded to the contrary that in the District a newspaper may be liable for actual damages suffered by a private person if it negligently publishes defamation, without actual malice.