STEAKS UNLIMITED, INC., Plaintiff,

v.

Donna DEANER and WTAE–TV 4 and Hearst Corporation, Defendants.

Civ. A. No. 77–803.

United States District Court,
W. D. Pennsylvania.

April 11, 1979.

Robert N. Gluck, Gluck & Miller, Wooster, Ohio, Wm. S. Schweers, Harrington & Schweers, Pittsburgh, Pa., for plaintiff.

Baker, Hostetler & Patterson, Cleveland, Ohio, John P. McComb, Jr., Moorhead & Knox, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

This is a defamation action that was filed in the United States District Court for the Northern District of Ohio and transferred here on defendants' motion for a change of venue. All defendants have moved for summary judgment pursuant to Fed.R. Civ.P. 56(b).

### I.

### *Facts*

On August 23, 1976, defendant, WTAE–TV, broadcast a consumer affairs story on its 6:00 p. m. news concerning a steak sale being conducted by the plaintiff, Steaks Unlimited, Inc., at several Pittsburgh area Zayre department stores. Defendant, Donna Deaner, was the newscaster and reporter who appeared on the broadcast in her position as a consumer affairs editor and newscaster for defendant, WTAE–TV. The broadcast concerned Steaks Unlimited's use of certain sales tactics and certain alleged misrepresentations about the quality of its

product, which was United States Department of Agriculture ("USDA") inspected, ungraded, frozen, tenderized, boxed beef, approximately equivalent to USDA "commercial" grade. The broadcast included a taped interview with one Aubrey Mills who was selling the steaks. A transcript of the broadcast is attached hereto as Appendix A.

Steaks Unlimited, an Ohio based firm, sold beef directly to the consuming public. Its method of sale in the Pittsburgh area involved holding a three or four day sale in front of, or inside, Zayre stores. At the end of the sale, Steaks Unlimited would place its unsold product back into tractor-drawn freezer trailers and move on to its next sale located somewhere outside the Pittsburgh area.

To promote its sales, Steaks Unlimited expended significant funds in advertising its product over local radio stations, through local newspapers, by large signs displayed at the sales locations and by handbills given to persons walking near Steaks Unlimited sales locations at the various Zayre stores.

As consumer affairs editor and newscaster for WTAE–TV, Deaner frequently received leads for stories through telephone complaints that Pittsburgh area consumers made to her. From Friday, August 20, 1976, through the morning of August 23, 1976, Deaner and WTAE–TV received numerous telephone complaints from Pittsburgh area consumers, complaining about the poor quality of Steaks Unlimited's beef as well as asserted misrepresentations as to the quality and type of beef being sold. Deaner also read Steaks Unlimited's advertisements in the August 19, 1976 edition of *The Pittsburgh Press,* noting that the advertisement did not make any statements of the USDA grade of the beef, or its equivalent, or the price per pound for the beef—all contrary to what she considered to be normally accepted practice in the Pittsburgh area for the sale of beef to the public.

Prior to the broadcast in question, Deaner had made over 700 consumer news broadcasts while employed at WTAE–TV, including investigatory reports on meat and meat sales, and she was generally knowledgeable about the USDA inspection and grading systems and the type of beef being sold by Pittsburgh-area supermarkets. According to her affidavit, she believed that all major Pittsburgh-area supermarkets advertised and claimed to be selling only USDA grades "choice" or "good" beef or its ungraded equivalent. Deaner also believed, from living in the Pittsburgh area, and from observing Pittsburgh supermarket ads, that beef was virtually always advertised at a price per pound.

Accordingly, the telephone complaints from consumers, in addition to the unusual features of plaintiff's advertisement, indicated to Deaner and her assistant, Ruth Lando, that further investigation was merited to determine whether to advise the consuming public in the Pittsburgh area about what then appeared to them to be the use of deceptive sales tactics.

On the morning of August 23, 1976, Deaner and Lando each telephoned Jean Ann Fox, then administrator of the Allegheny County Bureau of Consumer Affairs, to determine whether that government agency had investigated Steaks Unlimited. Citing a lack of sufficient manpower, Fox said she thought Steaks Unlimited's advertisement in the August 19, 1976 edition of *The Pittsburgh Press* might be in violation of state laws as deceptive and misleading, and she suggested that Deaner investigate the matter.

On the morning of August 23, 1976, Lando contacted Murphy's Meats—East Hills, Inc., a meat store located in the East Hills Shopping Center, the same Center where the Steaks Unlimited sale was being conducted. Lando discussed the sale by telephone with a representative of Murphy's Meats. Deaner and Lando then went to the East Hills Shopping Center but did not take a cameraman with them since at that time they had not yet decided whether to do a story concerning the steak sale. The steak sale was scheduled to conclude at the end of the next day.

When they arrived at East Hills Shopping Center, Deaner and Lando first visited Murphy's Meats, with whom Deaner had had prior experience; she believed its personnel to be reliable, accurate sources of information who were knowledgeable about meat quality, although Murphy's Meats was a competitor of Steaks Unlimited in this setting. The representative from Murphy's Meats indicated that he had bought a box of T-bone steaks from the sale and found them to be of very poor quality, in his opinion possibly the equivalent of USDA grades of "canner," "cutter," or "utility," which were grades of meat inferior to "commercial" grade.

Deciding in light of the advertisements, customer complaints, and information from Murphy's Meats, that Steaks Unlimited's operations merited closer scrutiny, Deaner and Lando then walked to the front of the East Hills Zayre store. Lando observed a Steaks Unlimited salesman and heard him make what she considered a misrepresentation of the price of the beef as well as represent to consumers that the steaks were equivalent to the beef sold in Pittsburgh supermarkets.

Lando then reported her observations to Deaner, who decided to enter the store and observe the sale first hand, still without a cameraman. Deaner observed one of Steaks Unlimited's salesmen, Aubrey Mills, attempting (in her opinion) to avoid giving an accurate price per pound, stating false prices per pound, and falsely saying that the beef sold by local Pittsburgh supermarkets was the same quality as that sold by Steaks Unlimited.

After Deaner requested a WTAE cameraman to film the story, Deaner and Lando returned to the East Hills Zayre store and Deaner conducted an interview with the salesman, Aubrey Mills, a portion of which interview was televised on the broadcast. In the interview, Mills made what the defendants assert are misrepresentations about the quality of the beef being sold by Steaks Unlimited. *See* Appendix A.

Early that afternoon, Deaner and Lando returned to the station and began preparing for the 6:00 p. m. newscast. Deaner telephoned the head of consumer affairs for Zayre Corporation, Stanley Berkovitz, to learn more about Zayre's involvement in the sale and to discuss her findings with Berkovitz. Berkovitz told Deaner that Zayre's agreement with Steaks Unlimited called for Steaks Unlimited to sell "commercial" grade beef at lower than supermarket prices.

In preparing the script for the broadcast, Deaner did the drafting and editing. She was supervised by William Church, the assistant news director at WTAE, who was the acting news director at that time. Church observed much of the film material as it was being edited, including the interview, and discussed the story with Deaner and Lando in the process of overseeing the preparation of the broadcast. Based on the investigation made, Deaner's history of accurate reporting, and the content of the filmed material, Church says he was convinced that the facts would be presented by the broadcast in a true and accurate manner.

John Conomikes, WTAE–TV's vice-president and general manager, contends that he received a telephone call later in the afternoon of August 23, 1976, from a person identifying himself as Darl Harkleroad, Steaks Unlimited's owner, threatening a lawsuit if the broadcast was aired. Conomikes responded that he would check out the story before it went on the air and called Church to discuss the accuracy of the proposed broadcast. Church reviewed the script with Conomikes and informed Conomikes that he believed the material contained in the broadcast was accurate. Shortly before air time, Conomikes also talked directly with Deaner, discussing the proposed broadcast and her investigation of the sale, and he says he was convinced that the broadcast would be truthful and accurate.

Late in the afternoon of August 23, 1976, Harkleroad also telephoned the WTAE newsroom and spoke with Lando, Deaner's assistant. Harkleroad wanted to talk to Deaner, but at that time she was unavaila-

ble. In his conversation with Lando, Harkleroad asked about the substance of the broadcast and attempted to persuade Lando that the meat Steaks Unlimited was selling was "quality" meat.

The broadcast went on the air as scheduled, with an introduction that Deaner had a "warning tonight." Deaner said that when she first looked at Steaks Unlimited's ad, she "had a feeling something was wrong." No mention in the ad of USDA quality grade was "a tipoff that something is being hidden," she said. What she found out at the Zayre store in East Hills was "totally deceptive and misleading." In the broadcast of the Aubrey Mills interview, Deaner said, "The truth of the matter is that they do everything possible to avoid telling you the price per pound, both in the ads and the sales pitch, because when you take the time to figure it out and compare prices, you'll find that the meat being sold here isn't that much cheaper than the meats being sold in local supermarkets or meat markets." Deaner went on to call Steaks Unlimited's statement that "commercial quality beef" is "fantastic" a "total misrepresentation." She went on to say that "every reputable supermarket or meat market in this area sells either choice or good quality beef. They would not even touch commercial quality meats." Deaner ended by saying "Today, Zayre's officials learned about the quality of the meat and the deceptive sales tactics, and decided to thoroughly end their endorsement of this big steak sale."

## II.

### Motion for Summary Judgment

■ As a first basis for summary judgment, defendants argue that the broadcast was substantially true and hence not defamatory. We agree in large part. Whereas defendants have, by affidavit, substantiated the truth of most of the broadcast, plaintiff has offered only a modicum of evidence to place the truth of the statements in issue. Resolving all doubts in favor of plaintiff, the non-moving party, however, we think there still is an issue as to the truth of whether the sales tactics were misleading, whether other Pittsburgh area stores were carrying boxed, "commercial" grade steaks that were unadvertised, and whether Zayres terminated plaintiff's sales because of deceptive practices.

■ As a second basis for their motion, defendants assert that much of the statements complained in the broadcast constitute opinion, not facts. As the Supreme Court made clear in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), under the First Amendment there is no such thing as a false idea. *See also Orr v. Argus Press Co.*, 586 F.2d 1108, 1114–15 (6th Cir. 1978). Only false statements of fact, accordingly, can be defamatory. While certain expressions in the broadcast, such as the announcement of a warning, may be considered opinion, we think that in substance what plaintiff complains of are factual statements.

As a third ground for the summary judgment motion, defendants contend that plaintiff was a "public figure" for purposes of the steak sale, and that plaintiff has put forth insufficient evidence that it can prove its case under the constitutional rules enunciated in the defamation area. We agree.

### A. Public Figure

In the seminal decision of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court held that the Constitution restricted the imposition of liability for the publication of defamatory false statements made concerning public officials unless the plaintiff could establish "actual malice." The phrase "actual malice" is a term of art, which the Supreme Court defined in *New York Times* as publication "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726.

Extending the rule of *New York Times*, the Supreme Court in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), extended the "actual malice" requirement to public figures.

Subsequently, refining the notion of "public figures," the Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1976), described two types of public figures. Some individuals of "pervasive fame or notoriety" are public figures in all contexts. *Id.* at 351, 94 S.Ct. 2997, 3013. Alternatively, "an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* The court went on to explain: "It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013. It is this latter or "vortex" public figure that we are concerned with here.

*In Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Supreme Court halted any further expansion of the public figure doctrine. There, the Court found that the Firestones' divorce dispute was "not the sort of 'public controversy' referred to in *Gertz*," 418 U.S. at 454, 96 S.Ct. at 965, even though of interest to some people. The court expressly concluded that by their appearance in the divorce action the parties had not " 'voluntarily exposed [themselves] to increased risk of injury from defamatory falsehood . . . .' " *Id.* at 456, 96 S.Ct. at 966.

Plaintiffs in a variety of situations have been deemed public figures within the meaning of the rule of *Curtis Publishing Co., Gertz,* and *Firestone. See, e. g., Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 at 1280, 1281 (3d Cir., 1979); *Orr. v. Argus Press Co.,* 586 F.2d 1108 (6th Cir. 1978); *Hutchinson v. Proxmire,* 579 F.2d 1027 (7th Cir. 1978); *cert. granted,* —— U.S. ——, 99 S.Ct. 832, 59 L.Ed.2d 31 (1978); *Vegod Corp. v. ABC,* 151 Cal.Rptr. 575 (Cal.App.1979), and cases cited therein. The determination when the plaintiff is a public figure is a question of law for the court. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Chuy v. Philadelphia Eagles Football Club, supra,* at 1281; *Wolston v. Reader's Di-*

*gest Ass'n, Inc.,* 188 U.S.App.D.C. 185, 187, 578 F.2d 427, 429 (1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 832, 59 L.Ed.2d 31 (1979).

■ In this case, plaintiff is clearly a public figure. It advertised its steak sale to the public extensively by means of newspaper and radio advertisements and handbills distributed in the vicinity of the sale. Certainly a large-scale sale of meat to the public is a matter of legitimate public concern. By marketing its product in a somewhat unusual fashion, plaintiff voluntarily exposed itself to public comment and criticism. As demonstrated by its advertising campaign, plaintiff had the means to refute defendants' criticism by resorting to the media.

Plaintiffs argue that there was no public controversy until the defendants created one. This argument misses the mark, however. In the first place, it is far from clear what difference it makes who uncovers a "public controversy." Secondly, and related to the first, defendants cannot create a "public controversy" over a matter that does not involve public interest regardless of the number of customer complaints concerning the steak sale. *See, e. g., Orr v. Argus-Press, supra; Hutchinson v. Proxmire, supra; Vegod Corp. v. ABC, supra.*

We conclude, therefore, that plaintiff was a public figure within the meaning of *Curtis Publishing Co.* and *Gertz* since plaintiff, an otherwise private person, voluntarily involved itself in a large-scale steak sale, which was a matter of public interest, by its widespread advertising and its management of the sale. By inviting the public's attention to the sale, plaintiff thrust itself into the vortex of any public comment regarding its management of an unusual, large-scale sale involving the public's health. *See, e. g., Orr v. Argus-Press, supra; Hutchinson v. Proxmire, supra; Vegod Corp. v. ABC, supra.*

## B. *Malice*

Having concluded that the plaintiff was a "public figure" and that it therefore may

not recover for defendants' alleged defamation in this matter unless it can prove that defendants made the broadcast with "actual malice," we go on to consider defendants' assertion that plaintiff has failed to meet its burden concerning proof of "actual malice." In general, courts are more disposed to grant summary judgment in first amendment cases involving public figures. *See, e. g., Washington Post Co. v. Keogh,* 125 U.S. App.D.C. 32, 35, 365 F.2d 965, 968 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Bon Air Hotel v. Time, Inc.,* 426 F.2d 858, 864–65 (5th Cir. 1970); *Martin Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947, 954 (D.D.C. 1976); *aff'd,* (D.C.Cir., March 31, 1978).

It appears that there is a split among the courts as to when summary judgment based on a failure to prove actual malice may be granted. One view is as follows:

"In my judgment *New York Times Co. v. Sullivan* makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth. *Cf. Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Unless the court finds on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant."

*Wasserman v. Time, Inc.,* 138 U.S.App.D.C. 7, 9, 424 F.2d 920, 922 (Wright, J., concurring), *cert. denied,* 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970). *See also Bon Air Hotel v. Time, Inc., supra,* at 864; *Wolston v. Reader's Digest Ass'n, Inc., supra,* 188 U.S.App.D.C. at 189, 578 F.2d at 431.

A second view is essentially the same as is specified in Fed.R.Civ.P. 56, that is, whether plaintiff has raised a genuine issue as to the existence of malice. We conclude that under either view, summary judgment in favor of the defendants is proper.

■ As refined in *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the term "malice" involves either knowledge that the publication was false or "a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity' . . . . [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of this publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *See also Dickey v. CBS, Inc.,* 583 F.2d 1221 (3d Cir. 1978).

■ Examining the record, we not only conclude that plaintiff cannot prove actual malice in the constitutional sense with the convincing clarity that would be required, but we also conclude that plaintiff has not, as required by Rule 56, pointed to specific facts from which an inference of malice may reasonably be drawn. *See Fram v. Yellow Cab Co.,* 380 F.Supp. 1314, 1335 (W.D.Pa.1974). Whereas defendants have detailed their investigation into the steak sale, plaintiff has only criticized these investigation techniques as insufficient, which under *St. Amant* is insufficient to raise an inference of malice. *See New York Times Co. v. Sullivan, supra; cf. Curtis Publishing Co. v. Butts, supra.* In this regard, plaintiff has not pointed to any aspect of defendants' investigations into the steak sale that can reasonably be considered so grossly deficient as to raise an issue as to malice.

It is important to remember the time constraints under which defendants were conducting their investigation. They began the morning of August 23 and investigated the story all day in preparation for the 6:00 p. m. newscast. Since August 24 was to have been the final day of the sale, the 6:00 p. m. newscast on August 23 was the latest practical time to give the public warnings about the sale. Although this situation does not fit precisely in the "hot news" line of cases, the less than 12 hours in which defendants had to investigate and prepare the newscast dictates a lesser standard of research than would be necessary for docu-

mentaries and the like. *See Dickey v. CBS, Inc., supra,* at 1228 n. 9; *Rosenbloom v. Metromedia, Inc.,* 415 F.2d 892, 895–96 (3d Cir. 1969), *aff'd,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

As evidence of malice, plaintiff also asserts that defendants purposely edited out of the broadcast all camera shots of, and references in the Aubrey Mills interview to, the sign that plaintiff displayed at the Zayre store disclosing certain facts about the sale. Defendants, however, have by affidavit denied these assertions, and plaintiff offers no evidence from which such intent can be reasonably inferred.

Finally plaintiff points to its inability to discuss the story with Deaner prior to the broadcast. Viewing the record most favorably to the plaintiff, however, we note that Darl Harkleroad, plaintiff's sole shareholder and president, did talk with both Ruth Lando, who was Deaner's assistant, and the station manager. Harkleroad asked Lando to explain what had transpired and volunteered to answer any questions. Deposition of Darl R. Harkleroad, January 9, 1978, at 35–36. In a later deposition, Harkleroad said that Lando refused to allow him to explain "some things to her," cutting him off in the middle of sentences. Deposition of Darl Harkleroad, June 14, 1978, at 99. Lando told Harkleroad that Deaner was in the editing room preparing for the 6:00 p. m. newscast and could not speak with him.

We do not believe that this testimony, in view of the entire record, is sufficient to withstand defendants' motion for summary judgment in this case. By Harkleroad's deposition testimony, nothing he said seemed to change Lando's mind. Thus, plaintiff has failed to show any knowledge of the falsity of statements in the broadcast, and we do not believe Lando's actions raised an inference of "reckless disregard" of whether or not the statements were false.

## III.

### Conclusion

In sum, we conclude that the record lacks any evidence from which "actual malice" can reasonably be inferred, and thus defendants' motion for summary judgment will be granted.

### Appendix "A"

PAUL LONG: Donna Deaner, our consumer affairs editor on Action News, has a warning tonight for those looking for bargains at a big steak sale.

DONNA DEANER: We're all looking for bargains these days, but when it comes to buying meat, you'd better know something about quality and the U. S. Government's meat grading system before you go running out to the big steak sale that's being advertised by Zayre's Department Stores and an Ohio firm called Steaks Unlimited.

Now, when I first saw this ad, I had a feeling something was wrong. First, there was absolutely no mention of any government quality grade—a tip-off that something is being hidden. Also, the price per pound was mysteriously missing from the ad. So, when I started getting complaints from the people who had bought the meat, I decided to check the merchandise out myself and what I found today at the Zayre's store in East Hills was totally deceptive and misleading.

Excuse me, sir; since you're doing most of the selling and talking, can I find out exactly what it is—what it is you're selling here?

AUBREY MILLS: Well, what we're selling are steaks, for a new company, Steaks Unlimited. Our home base is in Wooster, Ohio, and we have steaks, T–Bones, 20 T–Bones to a pack, lovely T–Bones, fully dressed and trimmed, for $21.75. Fantastic bargain.

DONNA DEANER: How much is the steak per pound?

AUBREY MILLS: Well, per pound the prices vary.

DONNA DEANER: The truth of the matter is they do everything possible to avoid telling you the price per pound, both in the ads and the sales pitch, because when you take the time to figure it out and

compare prices, you'll find that the meat being sold here isn't that much cheaper than the meats being sold in local supermarkets or meat markets.

Is this government-inspected meat?

AUBREY MILLS: Yes, yes, it is, yes, it is, fully government-inspected.

DONNA DEANER: And what about the grade?

AUBREY MILLS: Well, it's an ungraded —it's commercial graded.

DONNA DEANER: Is that any good?

AUBREY MILLS: Yes, it's fantastic. Ask some of our customers. Haven't you been satisfied?

DONNA DEANER: This is total misrepresentation. Commercial quality beef is not fantastic. As a matter of fact, commercial is the lowest quality meat available. It comes from old, tough animals and is sold to meat processors for use in hot dogs, lunch meats, canned soups and stews. But here, the company has tenderized this tough commercial beef with a variety of chemicals to make it palatable.

Well, how does that compare with the grades they sell in the supermarkets?

AUBREY MILLS: The grades they sell in the supermarkets? I wouldn't know. Some of the grades in the super ___ They have some ungraded beef in the supermarkets here.

DONNA DEANER: Another misrepresentation. Every reputable supermarket or meat market in this area sells either choice or good quality beef. They would not even touch commercial quality meats. So, before you get caught up in what seems to be a terrific beef bargain, find out exactly what quality of meat is being sold because you just might find, as in this case, that your best meat buys are still in our local markets.

And, by the way, you won't be seeing any more commercial quality beef being sold at the Zayre's stores in town. Today, Zayre's officials learned about the quality of the meat and the deceptive sales tactics, and decided to thoroughly end their endorsement of this big steak sale.

I'm Donna Deaner for Channel 4 Action News.